On Rehearing.
BREAUX, C. J.
The primordial title dates back to the days of the Spanish Colonies. The land in dispute is situated near Spanish Fort. The first grantee was Jean Lavergne (under a Spanish grant), who died in the year 1823, leaving children who resided at a distance from this city. They knew very little of the property and gave it no concern. The government went into possession of the property and built a fort, which it afterward abandoned.
The property, after it had been abandoned by the government, was granted by the United States government to Harvey Elkins.
The heirs of Lavergne brought suit on their grant in the early forties, and recovered the property from the heirs of the late Harvey Elkins, grantee of the government. The Lavergne heirs, it was decided, had complete title to the land over which the United States government had erroneously sought to exercise dominion.
At first, the land measured only 120 feet in one direction and 80 feet in another. Surveyors surveyed it under the title and extended the dimensions, which have not been questioned since, although, we take it, not included in the grant.
The suit of the Lavergne Heirs v. Elkins’ Heirs is reported in 17 La. 221. The decision in that case was for plaintiff.
In the years 1882 and 1883, the property was assessed in the name of L. Rankin, P. L. Blanchard, Joseph Cockyane, and John Nixon. They were the record owners at that time and remained owners for a number of years.
Whether the original grantee was Elkins or Lavergne is of no moment — it belonged to the persons just above mentioned. It was decided in the opinion heretofore handed down to whom the land belonged when it was assessed. That question is now at rest, i. e., that the persons just above named were the owners.
The facts are correctly stated in our opinion heretofore handed down. They have the *392 approval of learned counsel for the defendant who have reproduced the decision as part of their brief. We will not take further time in reproducing these facts. The opinion mentions the names of the owners when the assessment was made in 1882 and 1883; also; in 1885, when the property was adjudicated to the state. That is all-sufficient for the purpose of this decision. The error heretofore found was that the assessment was of property in squares 1582, 1583, 1602, 1605, 1607, and 1608; that there was want of precision in the description; and that the assessment was therefore illegal. The first two were imaginary squares. The property assessed was correctly bounded by Mexico, Genois, Passage, First, Fish, Lake, and Esplanade streets. The parties named in the tax deed owned no other property than that described. The lots were all given in nearly all of the different surveys and the proceedings as well. While it is true that it was not possible to locate lot 3, for instance, in imaginary square 1582, it was possible to locate 3 and the other lots of the owner within the boundaries as shown on the plats. In several cases, boundaries not as definite were held sufficient.
In Vannetta v. Busbey, 131 La. 681, 60 South. 76, the sections in which the land was situated were diffei'ent. The description in the deed was different from the description of the property in possession of the purchaser, and yet the court held that the description was sufficient.
The most serious objection to defendants’ claim is that the land does not belong to defendants; that they have no title.
We will copy freely from the testimony of witnesses for the defendants, as it has an important bearing upon this point. . It shows that the defendants had no title.
One of the witnesses, a distinguished member of the bar, was quite familiar with these titles and with the facts connected with the property. He states:
“The object of building this fence was this (referring to a fence which was put up on the property in the -year 1907): When I examined the title to the property in 1896, I discovered that there was no title to anything except the old Spanish Fort property, as shown by the Gelles’ plan, eceeept by possession." (Italics ours.)
The Spanish Fort property Mel not include the property in contest. The title to the Fort property did not include the lands which were sold at tax sale as before stated. We think it is a well-settled fact.
[7] Now as to possession, upon which defendant relies to establish title by prescription : It did not ripen into ownership. We have not found the date from which ownership began, or that the defendant had a 30 years’ possession of other than the Spanish Fort property.
Another witness, who was the president and organizer of the New Orleans, Spanish Fort & Lake Railway Company, testified:
“That, as a matter of fact, he did not at any time claim any property west of First and Lake street.”
The whole of his testimony, which is lengthy, shows that he, while president of the company, never considered the property claimed by plaintiffs as belonging to the company, nor did he consider it as being in possession of defendant’s author in title.
Two other witnesses have testified to the same effect.
The third witness, Mr. Robert C. Cage, a watchman employed by the New Orleans Spanish Fort & Lake Railway Company, testified that he never saw a fence on the place before the fence placed thereon in the year 1907. He never saw any one in possession of the property anterior to that time.
There was never a continuous, uninterrupted possession. Revised Civil Code, art. 3500.
*394 Prescription is restricted within just limits. Prescription óf 30 years acquired without title extends only to that which has been possessed by the persons pleading. Civil Code, art. 3503.
There has been no possession by the defendant of the land in contest. Finding no title in defendant, it does not occur to us that the defendant is in a position to successfully urge that plaintiff had no title; that the act under which the plaintiff holds is not legal.
[6] In the year 1908, plaintiff brought suit as the alleged owner of the property against the taxpayers before named. Under the law, he had a curator ad hoc appointed and obtained a judgment of confirmation of title in which the property was thoroughly identified and a full description given. The proceedings were regularly conducted. The curator ad hoc represented' the owners, whose whereabouts were unknown. The court had jurisdiction. The law upon the subject is plain, as interpreted in several decisions cited infra.' We think that the judgment is entitled to effect. We refer to Roussel v. Nixon et al., No. 86,935, Civil District Court. The judgment remained on the docket unquestioned all these years. No attempt to appeal or to question the validity of the judgment has even been made. Now, as to the defendant:' It has no standing in court.
The defendant has no right to this property unless title is produced.
Squares 1582 and 1583, mentioned as squares in which the land is situated, afford no ground for defense. Whatever error there may have been in inserting these squares in the assessment can be of no avail. The description was sufficient to identify the property, and the question to which this description gives rise is to be judged in the light of the following decisions: Shelly v. Friedrichs, 117 La. 679, 42 South. 218; Doyle v. Negrotto, 124 La. 100, 49 South. 992; Weber v. Martinez, 125 La. 663, 51 South. 679. In re Perrault’s Estate, 128 La. 453, 54 South. 939, is particularly pertinent. Moreover, we have already stated that the judgment obtained against the former owners represented by a curator ad hoc corrected the error.
Besides, if it is, as the late Mr. Pilie testified, it is hardly possible to hold that 1582 and 1583, existing only on the plan, have the effect of confusing descriptions to the extent of giving grounds for annulling title at this time. Spanish Fort proper at one time may have been thought to embrace land which was really not within its limits. There may have been irregular and indefinite possession exercised, without anything showing the date it commenced. The owner of Spanish Fort owned the Micas title, but that did not embrace the land in question, and the possession claimed beyond the line of Spanish Fort is not sufficiently proven to hold that the owners of Spanish Fort had become by possession the owners of the land now in controversy.
For reasons stated, it is ordered, adjudged, and decreed that our judgment heretofore handed down is avoided, annulled, and reversed. It is now ordered, adjudged, and decreed that the judgment of the Court of Appeal is affirmed. It is further ordered, adjudged, and decreed that defendants pay the costs of this court, Court of Appeal, and of the district court.
Addendum to Chiee Justice Bbeaux’s Opinion.
His Honor, John St. Pato,
rendered the opinion and decree of the court as follows:
In their brief for rehearing counsel says:
“One fact found by the court is not, in our opinion, borne out by the record. * * * There was no interruption in whatever possession it [the Spanish Fort Company] acquired in 187.8 up to the time of defendant’s acquisition (1909). It is true that its charter expired in 1903, and Mr. R. B. Fowler became its receiver, and it was in his capacity as receiver that he-placed the watchman on the property, and upon *396 discontinuing the watchman, as testified to by Mr. Farrar, erected the fence upon the old line.”
As we read the record, the last officers of the Spanish Fort Company (nominally still in office as late as 1908) were a president, who had left the state, and a secretary, who was no longer active. In the receivership proceedings he is termed “late secretary.”
No receiver was appointed to that company until June, 1908. And when the watchman was displaced and the fence erected in 1907 it was done, not by a receiver or officer of the Spanish Fort Company, but by the general manager of the New Orleans Terminal Company, and the only connection between that company and the Spanish Fort Company was that the former owned all the stock and all the bonds of the latter.
But this did not make the two companies one, or give the general manager of one company any authority to act for the other. In the case of Ferdinand Illg v. Stephen Brulard, Executor, decided by this court February 20, 1912 (No. 5,498 of our docket), we said:
“The fact that one person owns all the stock in a corporation does not destroy the corporation, or make him and the corporation one and the same person; but the latter continues to exist as a separate entity, and the former continues to occupy the status of a stockholder.”
As to the right of defendant to set up the alleged nullity of the judgment of confirmation (on the ground of fraud), that was in effect conceded for the purposes of this case, by the very fact that the court proceeded to examine and pass upon the alleged grounds of nullity. We merely refrained from declaring any general doctrine on a point which appeared to us as not being free from doubt.
But we held, and we still hold, that the correctness as distinguished from the validity, of a judgment of confirmation, obtained contradictorily with the true owner of the property is not open to investigation by any third person whomsoever. And the authorities cited by defendant hold nothing to the contrary.
In all these cases the right of third persons to challenge collaterally the validity of a judgment, not the correctness thereof, was upheld. And the distinction is obvious: If the judgment be null, there is then no judgment at all. On the other hand, if the judgment be valid, third persons hare no interest whatsoever in the correctness thereof.
In the case at bar, if the judgment of confirmation be binding on the former owners of the property, the defendant in this case has no more concern in the grounds upon which that judgment was based, or interest in the subject-matter thereof, than if the former owners had themselves conveyed the property to plaintiff by deed.
For that judgment itself, regardless of what foundation or lack of foundation it may have to rest upon, is a title translative of the property, having therefore all the force and effect of a conveyance between the parties thereto.
Such is the doctrine of the French Court of Cassation, as announced in two decisions of that eminent tribunal. See Veuve Mailly v. Commune d’Auneuil, February 21, 1827, reported in Dalloz, Jurisprudence du Royaume, Vol. 1833, part 1, page 301; and Commune d’Arbigny v. D’Arbigny, July 14, 1835, reported in Dalloz, Jurisprudence, etc., Vol. 1835, part 1, pages 326, 327.
In those two cases that high court distinctly held that a judgment awarding property to a plaintiff in an action had contradictorily with an apparent owner is a “just title;” i. e., a title translative of the property.
Our own Supreme Court has gone even further, citing twice with approval the doctrine of Toullier, that a judgment for the thing, obtained contradictorily with the apparent owner, is res judicata against the true owner. *398 (See Roach v. Craig, 124 La. 688, 50 South. 652, and Johnson v. Weld, 8 La. Ann. 126.)
From all of which it follows, as a matter of course and a fortiori, that a valid judgment against the true owner passes the title absolutely to the successful litigant, and is res judicata against all the world, regardless of the grounds or lack of grounds' on which it is based.
And this is particularly true of a judgment confirming a tax title. It is historically well known, and abundantly appears in our jurisprudence, that before the Constitution of 189S the status of tax titles in this state was such as can only be described as chaotic.
As a consequence of such conditions, tax sales were shunned, and property held by tax deed was a drug upon the market For want of bidders at the tax offerings, an immense amount of valuable property had to be taken over for taxes by the state, which had no use for it, and could not administer it, and could not get rid of it, or restore it to the tax rolls, except by giving it away, as it were. The almost uniform price for property sold, even under Act No. 82 of 1884, the so-called “Iron Clad Law,” was “one dollar,” a price which, under the Code, mean's a gift. C. C. art. 2464.
With full knowledge of these conditions, and endeavoring to correct them, the convention of 1898 directed the Legislature to provide “a form of proceeding to quiet tax titles.” Const, art. 233.
Pursuant to that constitutional mandate, the Legislature, at its first session thereafter, passed Act No. 101 of 1898, providing for the proceeding known as the action to confirm a tax title, which action was to be brought against “the former proprietor of the property,” and was to result in a judgment of the court “quieting and confirming the title.”
If the result of this constitutional mandate, and the Legislature intended to carry it into effect, be no more than to quiet and confirm tax titles as to the former owners only, divesting these of their property, indeed, but leaving the title still open to attack by all others, then vain, indeed, was the work of convention and Legislature, and futile all their efforts, which have resulted only in ousting one title, without “quieting or confirming” in any sense another, thus making confusion all the more confounded.
“Interest reipublicse ut sit finis litium” is the maxim and policy of the law; and both convention and Legislature intended that proceedings to “quiet and confirm tax titles” should be such in fact as well as in name.
That legislative purpose, which to us seems clear, is the guide by which we must go; and we have no hesitation "whatever' in holding that a judgment confirming a tax title, rendered contradictorily with the former owners of the property, is binding on all the world.
The statute violates no constitutional provision. Under it no man can be deprived of his property without due process of law, for the owner must be cited; but those who are mere possessors, with prescription running in their favor, but not completed, have no vested rights in the property (Oalvit v. Mulhollan, 12 Rob. 266-272), and are not necessary parties to the action for confirmation of title. The subsequent sale of the property to defendant affected in no manner the status of the confirmation proceeding, then already perfected, and gave to defendant only what its authors themselves then had, to wit, only an inchoate, contingent, or expectant right to complete a title by prescription, if not disturbed.
. The authorities cited, as to a defendant in possession under title, are not applicable.
We stated at the outset of our opinion that plaintiff must recover on the strength of his own title, and it is our conclusion that from the time of the confirmation his title was and is good against the world.
As to the claim that lot No. 1 of square *400 1605 is included in the deed from Micas to the Spanish Port Company, passed before John Bendernagle, notary, on June 7, 1879, defendant is in error. According to the plan of Edgar Pilie, surveyor, dated January 11, 1909, that lot is situated at a distance of 426 feet from the Bayou St. John, measured along the prolongation of First street (380 + 110 = 490 - 64 = 426), and about the same distance along the line of the old bulkhead. But the deed aforesaid conveys no land distant more than 419 feet from the bayou at any point, and hence does not include the aforesaid lot No. 1, nor any part thereof.
As to defendant’s call in warranty, we have not noticed it, because this court is powerless to deal with it in this appeal. Under the jurisprudence, a judgment cannot be amended between coappellees.
We venture the suggestion, however, that defendant is not without a remedy, if pursued in time.
Rehearing refused.
Dufoub, J., takes no part.
See dissenting opinion of LAND, J., 61 South. 414.